## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **April Bagwell** ) | |
| ) | |
| **Plaintiff,** ) | **CLASS ACTION COMPLAINT** |
| ) | |
| **v.** ) | **Case No.**_____ |
| ) | |
| **Cox Communications, Inc.,** ) | |
| ) | |
| **Defendant.** ) | |
| _____) | |

Plaintiff April Bagwell, on behalf of herself and a class of similarly-situated individuals, bring this Class Action Complaint against Cox Communications, Inc. ("Cox") and alleges the following:

### INTRODUCTION

1.      This is a class action brought on behalf of all persons who reside or resided during the relevant times in Cox's Nebraska market in or around Omaha, Nebraska who purchased Premium Cable (as defined below) from Cox and who also rented a set-top box from Cox. During the relevant times, Cox Premium Cable subscribers could not access all of the services to which they subscribed without also renting a set-top box from Cox. Cox abused its substantial economic power in the market for Premium Cable in the parts of Nebraska in which it operates (the "Nebraska market") by forcing subscribers, as a condition of purchasing its Premium Cable services, to rent set-top boxes from Cox.

2.      That conduct enabled Cox to severely constrain competition in the market for the sale or lease of set-top boxes and to extract supra-competitive profits from members of the class by overcharging for its set-top boxes. Cox's conduct has had and

1

continues to have substantial adverse effects upon interstate commerce and has caused and continues to cause direct economic injury to members of the class.

3.     As set forth below, Cox tied the distribution of set-top boxes to the provision of Premium Cable and thereby unreasonably restrained trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

## THE PARTIES

4.     Plaintiff April Bagwell is a citizen of the State of Nebraska who resides in Bellevue. During the relevant time period, Plaintiff subscribed to Cox Premium Cable and rented one or more set-top boxes from Cox.

5.     Defendant Cox Communications, Inc. is a Delaware corporation with its principal place of business in Atlanta, Georgia.

6.     Among other endeavors, Cox provides multi-channel video programming distribution ("MVPD") through a cable network and also leases set-top boxes to the vast majority of the subscribers to its MVPD services.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 because Plaintiff, on her own behalf and on behalf of the Class, asserts claims under the Sherman Act, 15 U.S.C. § 1.

8.     Venue is proper in this Court under 15 U.S.C. § 22 because Cox may be found here and transacts business here.

## FACTUAL ALLEGATIONS

9.     Cox is one of the largest providers of cable MVPD in the United States.

10.     Cable MVPD providers tend not to compete with one another and face little competition from MVPD providers who use another format besides cable. Accordingly, Cox has substantial economic power in the areas in which it operates, including in its Nebraska market.

11.     Cox, through the conduct described herein, abused its economic power over cable MVPD in general and Premium Cable in particular in the Nebraska market and committed a classic per se tying violation. Cox compelled consumers who purchased its Premium Cable services to also rent from Cox a separate product. That separate product, a set-top box, is an extension of a television set that consumers must use to access the full range of Cox Premium Cable services that they have purchased. The monthly rental fee that Cox forces consumers to pay for set-top boxes quickly adds up to more than the cost that Cox pays to purchase set-top boxes from their manufacturers.

<u>The Tying Product: Premium Cable</u>

12.     Cox, like other cable MVPD providers, offers various types and tiers of cable products, including Premium Cable, which Cox referred to during the relevant time as "digital cable" and/or "Advanced TV."

13.     Premium Cable is a high quality and user-friendly product. It includes an interactive programming guide, which enables subscribers to quickly navigate through their substantial array of channels and determine when and where particular programs will appear; pay-per-view, which allows subscribers to purchase special programs like live sporting events that are not otherwise broadcast; on-demand, which allows subscribers to watch certain programs whenever they choose simply by pushing a button; high-definition channels, which present programs in a crisper, more life-like format than

their standard counterparts; a range of premium and specialty channels; and a range of channels that subscribers can pay to receive such as HBO.

14.     Premium Cable is a uniquely-desirable product because it allows consumers, without leaving the comfort of their home and without resorting to multiple systems, to efficiently sift through a wide number of programs and find one that suits their interest at any given moment.

15.     Customers pay a significant additional monthly fee for Premium Cable as compared to cable packages that include substantially fewer linear channels and have few if any interactive features.

16.     The Federal Communications Commission's ("FCC") Thirteenth Annual Report ("the Report") on video programming indicates that, in 2005, there were almost 97 million Premium Cable subscriptions in the United States and that number continued to grow during most of the relevant time period.

17.     As described in further detail below, Premium Cable subscribers cannot access Premium Cable by simply plugging Cox's MVPD cable into a television. Instead, they need an additional product to interface between the MVPD cable and a television. In contrast, subscribers to lower levels of service could, during the relevant time period, access the linear channels to which they subscribed by plugging the MVPD cable into most modern televisions, which are "cable-ready."

18.     A digital receiver or digital converter, which is commonly referred to as a set-top box, is the product that provides an interface between an MVPD cable and a television and that allows customers to access all of Cox's Premium Cable services.

19.     Premium Cable, as defined in paragraph 14 above, is the tying product.

The Tied Product: Set Top Boxes

20.     A set-top box is an extension of a television set that enables consumers to use and view Premium Cable.

21.     Most televisions sold in the United States during the last decade are capable of receiving certain programs transmitted through a cable MVPD system. As a matter of pure technical capacity, such "cable-ready" televisions would allow consumers to access most premium channels available on Premium Cable.

22.     Cable-ready televisions cannot, however, access the interactive programming guide, pay-per-view, on-demand, and other interactive (or two-way) services that give Premium Cable much of its value.  To access those services, consumers need the ability not just to receive signals from a cable MVPD system but also to communicate with the cable MVPD system and transmit a particular selection from a range of options. It is precisely those services that allow subscribers to personalize their programming choices and give Premium Cable much of its value and define its unique product nature.

23.     A set-top box is the only product that has the required two-way communication capability that allows Cox's consumers to access the full range of Premium Cable services. During the relevant times, Premium Cable subscribers were required have set-top boxes to access Cox's interactive programming guide and all pay-per view and on-demand services.

24.     Cox rents to its Premium Cable subscribers a variety of types of set-top boxes with different functionalities and accordingly different prices. These include standard definition set-top boxes, high definition set-top boxes, standard definition set-

top boxes with digital video recording ("DVR") capability, and high definition set-top boxes with DVR capability.

25.     Although the set-top boxes have differing features, they all constitute a single tied product for purposes of an antitrust tying claim.

26.     With respect to set-top boxes with DVR capability, Cox also charges a monthly "DVR Recording Fee." This fee is part of the rental charge of the set-top box, as all the recording functionality is contained in the set-top box itself. Cox internal documents confirm that Cox itself considers the DVR Recording Fee to be interchangeable with the nominal rent apart from that fee charged for DVR set-top boxes.

27.     Consumer electronics companies, such as Motorola and Scientific Atlantic (later Cisco), manufacture set-top boxes and sell them to MVPD providers such as Cox, which in turn rents them to its subscribers.

28.     Thus, Cox has a direct economic interest in rentals of the tied product even though it does not itself manufacture the tied product.

29.     As described in greater detail below, Cox forces consumers who purchase Premium Cable to rent the set-top boxes from Cox for a monthly fee.

30.     Set-top boxes are the tied product.

Premium Cable and Set-Top Boxes are Separate Products

31.     Consumers have demonstrated a demand for acquiring set-top boxes apart from Premium Cable. In response, retail vendors have sold and continue to set-top boxes at retail apart from subscriptions to Premium Cable. Companies such as TiVo sell set-top boxes at retail for many hundreds of dollars.

32.     Consumers also rent set-top boxes in varying proportions to their subscriptions to Premium Cable. Often, a household will have one Premium Cable subscription while renting two or more set-top boxes attached to different televisions.

33.     Cox itemizes its fees (as required by FCC regulations) so as to clearly distinguish the price of Premium Cable from the price for rental of set-top boxes in its billing statements to customers and in regulatory filings.

34.     In previous litigation, Cox and its experts have either admitted that Premium Cable and the set-top box are separate products and/or have not contested this point.

35.     Thus, Premium Cable and the set-top box are separate products for purposes of an antitrust tying claim.

Consumers Who Purchase Premium Cable From Cox Are Also Forced To Rent Set-Top Boxes From Cox

36.     During the relevant times, Cox forced consumers who purchased its Premium Cable service to also rent set-top boxes from Cox.

37.     Cox made the tying requirement clear on its websites and other communications directed at subscribers and potential subscribers.

38.     When Premium Cable subscribers contact Cox regarding set-top boxes, Cox's representatives reinforce the requirement that the subscribers must rent set-top boxes from Cox. More specifically, Cox's representatives state: (1) that if subscribers do not have a set-top box, they will not be able to access the interactive programming guide, on Demand, or pay-per-view services, and (2) that subscribers cannot purchase a set-top box from Cox.

39.     That set-top boxes obtained from a source other than Cox will not be able to access all the services and features of Premium Cable is another means of requiring consumers to submit to its illegal tie. The reason those set-top boxes do not achieve full functionality on Cox's cable MVPD system is not because they lack a critical technology over which Cox has sole control, as all set-top boxes utilize the same basic technology and components.

40.     The monthly rental fee that Cox charges consumers for set-top boxes quickly adds up to more than the price that Cox paid to purchase the set-top boxes in the first place, leaving Cox with months of pure profit once the purchase price of the set-top box is fully paid off and consumers with a substantial loss.

41.     Congress indicated in Section 629 of the Communications Act that it expects consumers to have choice in their selection of set-top boxes. 47 U.S.C. § 549. The FCC has interpreted Section 629 as prohibiting cable MVPD providers from taking advantage of their security concerns to require consumers to use the set-top boxes that they distribute.

42.     Although cable-ready televisions have the technological capacity to receive certain Premium Cable services, cable MVPD providers, including Cox, encrypt or scramble the data they transmit through their cable MVPD systems. This security practice prevents consumers from receiving Premium Cable services to which they do not subscribe.

43.     Consumers need a special device to descramble or unencrypt Premium Cable. Consumers who do not have such a device will not be able to access or view the Premium Cable services to which they subscribe.

44.     There is no valid reason technologically or otherwise to bundle the device that performs this security function with the digital conversion and two-way communication functions of set-top boxes or to stifle innovation into new technologies by a competitive market. Nevertheless, cable MVPD providers, including Cox, have done just that and have successfully taken steps to ensure that most consumers do not receive the security device separate from a set-top box as set forth above.

45.     In response, the FCC prohibited cable MVPD providers from requiring consumers to use security devices that are integrated with set-top boxes. This prohibition, sometimes referred to as the "integration ban," recognizes that when cable providers succeed in creating an environment in which consumers must use the set-top boxes that they distribute, competition in the set-top box market will be drastically reduced. It also implicitly recognizes that cable providers have economic power in markets related to the provision of cable MVPD.

46.     Cox made, at best, minimal efforts to comply with the integration ban. It nominally offers a device known as a CableCARD, which can perform the required security function and which can be plugged directly into certain cable-ready televisions and, in theory, into certain non-integrated set-top boxes.

47.     CableCARDs are not substitutes for set-top boxes, for they do not perform two-way communication and thus do not allow Premium Cable subscribers to access valuable Premium Cable services that they have purchased.

48.     Cox made almost no efforts to publicize the availability of CableCARD as an option to receive at least the linear programming aspects of Cox Premium Cable without renting a set-top box from Cox and has exaggerated and misrepresented the

limitations of CableCARD in its communications to subscribers and potential subscribers.

49.   Cox has taken additional measures to limit the availability and attractiveness of CableCARDs. For example, the FCC recently found that Cox changed the signal of certain popular channels to a format, "Switched Digital Video," that CableCARDs could not receive in order to make set-top boxes, which can receive that format, more attractive. *In the Matter of Cox Communications, Inc., Fairfax County, Virginia Cable System*, File No. EB-07-SE-351 (Oct. 15, 2008).

50.   Among other things, Cox also required Premium Cable subscribers to rent the CableCARDs that it distributes and for most of the relevant time period, charged them an installation fee. That charge is particularly egregious, as the installation simply consists of inserting a CableCARD into an open slot in a cable-ready television. By contrast, Cox Premium Cable subscribers who rent a set-top box from Cox have the option of self-installing the set-top box and avoiding the installation fee.

51.   Most significantly, Cox distributed a strikingly small number of CableCARDs. According to the National Cable and Telecommunications Association's filings with the FCC, at the end of May 2009, Cox has less than 40,000 CableCARDs in service. By comparison, Cox has millions of set-top boxes in service.

52.   Based on figures for other Cox markets, well over 95 per cent of Premium Cable subscribers in Cox's Nebraska market rent a set-top box from Cox and thus comply with the tie alleged in this case.

53.   In essence, Cox has done and is doing everything in its power to protect its illegal tie of Premium Cable to set-top boxes.

<u>Cox Possesses Economic Power In The Tying Market</u>

54.     As numerous statistics demonstrate, Cox has the requisite economic power in the market for Premium Cable to force consumers to submit to its illegal tying practice.

55.     Those statistics include direct evidence of Cox's consistently rising price for Premium Cable (without losing customers) and indirect evidence showing Cox's substantial share of the market for Premium Cable in the Nebraska market.

*Cox Regularly Increased The Price Of Premium Cable Without Losing Customers*

56.     As one of the largest cable MVPD providers in the country, including in the Nebraska market, Cox repeatedly raised the price of Premium Cable during the relevant time period.

57.     At the same time, Cox gained a substantial number of Premium Cable subscribers over the relevant time period.

58.     Cox's ability in its Nebraska market to raise the price of Premium Cable, without losing Premium Cable customers, demonstrates that it has sufficient economic power to unlawfully tie set-top boxes to Premium Cable in its Nebraska market.

59.     Internal Cox documents also show that Cox engages in strategic pricing behavior characteristic of a competitor with substantial market power.

*Cox Has A Substantial Share Of The Relevant Market*

60.     The relevant product market is Premium Cable and the relevant geographic market is Cox's Nebraska market.

61.     Premium Cable is the relevant product market for the reasons set forth in paragraphs 12-19 above.

11

62.     Cox's Nebraska market is the relevant geographic market. According to the FCC and other authorities, the incumbent cable MVPD providers' footprint in a particular area is the proper geographic market for purposes of antitrust analysis. And Cox's internal documents pervasively use the Nebraska market as its unit of analysis when evaluating competitors and market share.

63.     Cox has a market share of well over 50% in the market for Premium cable in the Nebraska market.

64.     Generally, Cable MVPD is the dominant form of MVPD nationwide. According to a 2007 Congressional research report, Cable MVPD makes up 69% of all MVPD in the United States.

65.     The remaining MVPD is primarily transmitted by the direct-broadcast satellite providers (DirecTV and Dish Network) and companies derived from Regional Bell Operating Companies (Verizon and AT&T U-verse). Although these companies also provide Premium Cable or its equivalent, the market share of these competitors put together was during the relevant times less than that of Cox in the Nebraska market.

66.     Potential challengers to an incumbent cable MVPD provider, be it cable MVPD or another form of MVPD, face significant entry barriers.

67.     The first and most basic barrier to entry is the huge cost of building a wireline or satellite-based MVPD system.  Cable MVPD providers invested over $100 billion to construct advanced two-way fiber optic networks.  It is estimated that they spent $10.6 billion on capital improvements in 2005 and $11.1 billion in 2006.  These advances allow cable MVPD providers to offer Premium Cable. An MVPD provider

whose infrastructure does not allow it to offer premium services simply cannot compete with an incumbent cable MVPD provider.

68.    Moreover, whereas incumbent MVPD providers faced virtually no competition when they were building their infrastructure and have been able to self-finance advanced infrastructure projects with high prices, challengers will have to charge lower, competitive prices and seek outside financing to acquire the necessary infrastructure.

69.    Incumbent cable MVPD providers thus have a classic first mover advantage and are in a unique position to maintain, and take advantage of, the necessary economies of scale and scope.

70.    The franchising process in many localities may also be a barrier to entry.

71.    A third entry barrier is that incumbent cable MVPD providers offer valuable programming to which challenges do not have access. Incumbent cable MVPD providers often have exclusive contracts with key content providers, who control the programming that is most important to consumers, such as regional sports networks. In addition, incumbent cable MVPD providers own or control a number of popular content providers, and, under certain circumstances, are permitted to refuse to provide potential challengers with that content or to provide them content on discriminatory terms. This further limits potential challengers' ability to offer competitive products.

72.    Special circumstances surrounding multiple dwelling units ("MDUs"), such as apartment buildings and cooperatives, form a fourth entry barrier. Incumbent cable MVPD providers often have long-term contracts, with automatic renewal privileges, to serve as the exclusive MVPD provider for MDUs. With 30% to 35% of the

country's population living in MDUs, that means that incumbent cable providers have already locked up a significant segment of potential consumers.

73.     Thus, even assuming that other forms of MVPD are substitutes for cable MVPD, the many substantial entry barriers have kept their market share so low that they lack the power to constrain cable MVPD providers.

74.     The foregoing makes clear that Cox has sufficient economic power in the market for Premium Cable in the Nebraska market to enforce its illegal tying scheme.

Cox's Illegal Tie Affects A Not Insubstantial Amount Of Commerce In The Market For Set-Top Boxes

75.     Cox obtains several million dollars per year from the rental of set-top boxes in the Nebraska market. Thus, Cox's tie affects a substantial amount of commerce in the tied product market.

76.     Furthermore, consumers seeking set-top boxes have purchased them from retailers online and in electronics stores. Companies such as TiVo sell a single set-top box for hundreds of dollars.

77.     Given the efforts of Cox and the other cable MVPD providers to control the provision of set-top boxes through the illegal tie, the fact that set-top boxes are being sold at all shows the eagerness of consumers to secure set-top boxes in an open market.

78.     Consumer electronics manufacturers have noted that eagerness and objected to the FCC regarding the conduct of cable providers that restricts their ability to sell unintegrated set-top boxes to Premium Cable subscribers. These manufacturers have devoted several millions of dollars to developing set-top boxes intended for sale directly to consumers at retail.

79.     The fact that Premium Cable subscribers have, for the most part, succumbed to cable MVPD providers' inflated pricing of set-top boxes offers additional incentive to consumer electronics manufacturers, for it shows the high value that consumers place on Premium Cable and set-top boxes. Indeed, with their history of entering a wide range of markets and offering innovative, attractive, and successful products, the prospect for consumer electronics manufacturers to sell unintegrated set-top boxes to Premium Cable subscribers should be great.

80.     If not for Cox's illegal tying practices, which artificially forecloses a substantial amount of potential sales of set-top boxes from sources other than Cox, substantially more set-top boxes would be sold on the open market than is presently the case and the costs for such set-top boxes, whether purchased or rented and whether obtained from Cox or some other source, would be substantially lower.

Cox's Illegal Tie Has Caused Antitrust Injury to Plaintiff and the Members of the Class

81.     As a result of Cox's tie, Plaintiff and the members of the class have paid higher rental rates for set-top boxes than they would have paid in the absence of the tie. In a competitive market (*i.e.* one without a tie), numerous providers would compete to offer set-top boxes to Cox Premium Subscribers and the competition among such providers would result in lower prices and more innovative and varied products.

82.     This injury flows directly from the anticompetitive aspects of Cox's conduct. Cox's tie precludes free and fair competition in the market for set-top boxes and such lack of competition leads to higher prices than would otherwise by the case.

## CLASS ACTION ALLEGATIONS

83.    Pursuant to Fed. R. Civ. P. 23(b)(3), Plaintiff brings this action on behalf of herself and all others similarly situated as members of the proposed Class. That Class is defined as follows:

> All persons in Cox's Nebraska market who subscribed to Cox for Premium Cable and paid Cox a monthly rental fee for an accompanying set-top box.

> Excluded from the Class are Cox's officers, directors or employees; any entity in which Cox has a controlling interest; the affiliates, legal representatives, attorneys, heirs or assigns of Cox; Plaintiff's counsel; any federal, state, or local governmental agency; and any judge, justice, or judicial officer presiding over this matter and members of their immediate families and judicial staffs.

84.    Plaintiff seeks certification of the Class under Federal Rules of Civil Procedure Rule 23(a) and (b)(3).

85.    <u>Numerosity:</u> The members of the Class are so numerous that their individual joinder would be impracticable in that: (a) the Class includes thousands of individual members; (b) it would be impractical and a waste of judicial resources for each of the thousands of individual members of the Class to be individually represented in separate actions; and (c) the relatively small amount of damages suffered by individual members of the Class does not make it economically feasible for them to file individual actions to protect their rights.

86.    <u>Commonality/Predominance:</u> Common questions of law and fact predominate over any questions affecting only individual members of the Class. These common legal and factual questions include, but are not limited to, the following:

a.   Whether Cox is liable to Plaintiff and the Class for violations of federal antitrust laws;

b.   Whether Cox has established an unlawful tying arrangement for the rental of set-top boxes, in violation of federal laws;

c.   Whether Cox's actions have caused antitrust injury and damages to Plaintiff and the Class;

d.   Whether Cox should be enjoined from further violations of state and federal laws; and

e.   Whether Cox is liable to Plaintiff and the Class for treble damages as a result of its violation of federal antitrust laws.

87.   Typicality:  Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class have been injured by the same wrongful practices engaged in by Cox.  Plaintiff's claims arise from the same practices and course of conduct that gives rise to the claims of the members of the Class and are based on the same legal theories.

88.   Adequacy:   Plaintiff will fully and adequately assert and protect the interests of the Class they seek to represent. Plaintiff has retained counsel who are experienced in class actions and complex mass tort litigation and who have been litigating cases practically identical to this for several years. Neither Plaintiff nor their counsel have interests contrary to or conflicting with the interests of the Class.

89.   Superiority: A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims by each of the members of the Class is economically unfeasible and impractical.

17

While the aggregate amount of the damages suffered by the Class is in the millions of dollars, the individual damages suffered by each member of the Class as a result of the wrongful conduct by Cox is too small to warrant the expense of individual lawsuits. Even if the individual damages were sufficient to warrant individual lawsuits, the court system would be unreasonably burdened by the number of cases that would be filed.

90.     Plaintiff does not anticipate any difficulties in the management of this litigation. The federal courts have substantial experience in managing antitrust class actions. Plaintiff's counsel have litigated a similar case to trial and the trial presented no manageability issues.

## COUNT I

### (Violation of Section 1 of the Sherman Antitrust Act for Unlawful Tying)

91.     Plaintiff incorporate by reference the preceding paragraphs as if fully set forth herein.

92.     The Sherman Antitrust Act makes it unlawful to enter into a contract in restraint of trade or commerce. 15 U.S.C. § 1. Congress has granted a private right of action to individuals harmed by violations of this act. 15 U.S.C. § 15.

93.     Cox improperly tied and ties its Premium Cable service to the rental of set-top boxes that it rented and rents to its subscribers. Specifically, as explained above, Cox provided and provides Premium Cable to Plaintiff and all members of the Class on the condition that Plaintiff and all members of the Class also rent the set-top boxes from Cox.

94.     The market for set-top boxes is separate and distinct from the market for Premium Cable, just as a set-top box is a separate product from Premium Cable.

18

a. For an order certifying the Class pursuant to Fed. R. Civ. P. 23, appointing Plaintiff as the Class Representative, and appointing counsel for Plaintiff as counsel for the class;

b. For an Order that Cox violated the Sherman Antitrust Act, 15 U.S.C. § 1;

c. For an Order enjoining Cox from continuing the practice of tying Premium Cable services to the rental of a set-top box from Cox;

d. For an award of all statutory damages under the Sherman Antitrust Act;

e. For an award of all compensatory and other damages suffered by Plaintiff and the Class;

f. For an award of all costs incurred by Plaintiff in pursuing this action;

g. For an award of reasonable attorneys' fees; and

h. For any other relief the Court deems reasonable.

## **JURY DEMAND**

Plaintiff demands a trial by jury of all issues triable.


Dated: August 25, 2016                        Respectfully submitted,



Steven M. Delaney
steve@rmdlaw.net
REAGAN MELTON & DELANEY LLP
9826 Giles Road, Suite B
La Vista, Nebraska 68128
Telephone: (402) 932-9494

Todd M. Schneider (to be admitted pro hac vice)
TSchneider@schneiderwallace.com
Jason Kim (to be admitted pro hac vice)

20

jkim@schneiderwallace.com
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS, LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
(415) 421-7100 (Telephone)
(415) 421-7105 (Facsimile)

Allan Kanner (to be admitted pro hac vice)
a.kanner@kanner-law.com
Cynthia St. Amant (to be admitted pro hac vice)
c.stamant@kanner-law.com
KANNER & WHITELEY, LLC
701 Camp Street
Arizona, Louisiana 70130
(504) 524-5777 (Telephone)
(504) 524-5763 (Facsimile)

Joe R. Whatley, Jr. (to be admitted pro hac vice)
jwhatley@wdklaw.com
WHATLEY DRAKE & KALLAS, LLC
380 Madison Avenue, 23rd Floor
New York, New York 10017
(212) 447-7070 (Telephone)
(212) 447-7077 (Facsimile)

**ATTTORNEYS FOR PLAINTIFF**